

FILED

Jul 14 2016, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Jenny R. Buchheit
Seth M. Thomas
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jeffrey C. Rocker
Jeffrey L. Beck
Beck Rocker, P.C.
Columbus, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Randy Faulkner & Associates, Inc. and Randall W. Faulkner, <br><br> *Appellants-Defendants,* <br><br> v. <br><br> The Restoration Church, Inc., <br><br> *Appellee-Plaintiff.* | July 14, 2016 <br><br> Court of Appeals Case No. 41A01-1506-PL-706 <br><br> Appeal from the Johnson Superior Court <br><br> The Honorable Kevin M. Barton, Judge <br><br> Trial Court Cause No. 41D01-1305-PL-68 |

**Robb, Judge.**

# Case Summary and Issues

In 2009, The Restoration Church, Inc. ("the Church") leased premises from Randy Faulkner and Associates, Inc. ("RFA"). In 2012, RFA gave the Church written notice to vacate the premises. After vacating the premises, the Church

filed suit against RFA and Randall W. Faulkner, the owner of RFA, for breach of contract, among other claims. RFA and Faulkner countersued the Church for breach of contract and various tort claims, including defamation and tortious interference with a business relationship. Some of the parties' claims were decided by summary judgment, but the parties' breach of contract claims and RFA's and Faulkner's tort claims remained. Following a four-day bench trial, the trial court entered judgment for the Church on the parties' breach of contract claims and awarded the Church in excess of $322,000 in damages. The trial court also entered judgment for RFA and Faulkner on their claim of tortious interference with a business relationship, but concluded they were not entitled to any damages because their evidence was speculative.

[2] RFA and Faulkner present four issues on appeal and the Church presents one issue on cross-appeal. We consolidate the issues into two dispositive issues: 1) whether the trial court erred when it found that RFA had waived its right to receive thirty days' written notice of the Church's intent to renew the parties' lease agreement; and 2) whether the trial court clearly erred when it concluded that RFA's and Faulkner's evidence of damages on their claim for tortious interference with a business relationship was speculative.

[3] We conclude the trial court's determination that RFA had waived its right to receive written notice of the Church's intent to renew the parties' lease agreement is not supported by sufficient evidence. We also conclude the trial court's determination that RFA's and Faulkner's evidence of damages on their tort claim was speculative is not clearly erroneous. Accordingly, we reverse the

trial court's judgment for the Church on the Church's breach of contract claim and vacate the corresponding damage award, affirm the trial court's judgment that RFA and Faulkner are entitled to no damages on their tort claim, and remand for further proceedings.

# Facts and Procedural History[1]

[4] RFA purchased a complex of buildings known as "Polk Place" in Greenwood, Indiana in December 2008. Throughout 2009, several members of the Church invested many hours of labor and the Church itself invested $435,906.79 to restore a building on the property for use as a worship center. On October 7, 2009, RFA and the Church entered into a lease agreement for the property. At the time, Faulkner, the owner of RFA, attended the Church. Although RFA believed the fair rental value of the restored property to be $14,000 per month, RFA agreed to rent the property to the Church for one year at $100 per month, and RFA agreed to provide the Church with six one-year options to renew that agreement.

[5] In particular, the lease agreement, which was negotiated by counsel for both RFA and the Church, states, in relevant part, as follows:

SECTION ONE
SUBJECT AND PURPOSE

---

[1] We held oral argument on June 2, 2016, in French Lick, Indiana, as part of the Indiana State Bar Association's Solo and Small Firm Conference.

Lessor [RFA] leases the building and land . . . known as "Polk Place," . . . to Lessee [the Church] for Lessee's use of operating a church and the related ministries of a church.

SECTION TWO
TERM AND RENT

A.      Lessor demises the above-described premises for a term of one year, commencing [***date***],[2] and terminating on [***date***], at 11:59 p.m., or sooner as provided in this Lease agreement, at the annual rental of [***FAIR MARKET VALUE***] Dollars ($***), payable in equal installments of [***] Dollars ($***) in advance on the first day of each month for that month's rental, during the term of this Lease agreement. However, *so long as Lessee is not in breach of any provision of this Lease or in holdover status Lessor agrees to accept payment of One Hundred Dollars ($100.00) per month* plus a cash donation receipt for the balance (or by some other such method to maximize Lessor's tax benefit from foregoing the majority of the rent as Lessor's accountant may direct).

* * *

SECTION THIRTEEN
DEFAULT OR BREACH

Each of the following events shall constitute a default or breach of this Lease agreement by Lessee:

---

[2] As the trial court noted in its order, "[t]he dates of the lease term and the fair market value were omitted from Section Two.  The document retains language used to mark the space."  Appendix of Appellants at 41.

\* \* \*

      (3)  If Lessee shall fail to pay Lessor any rent or additional rent when the rent shall become due and shall not make the payment within seven (7) days after notice thereof by Lessor to Lessee.

      (4)  *If Lessee shall fail to perform or comply with any of the conditions of this Lease agreement and if the nonperformance shall continue for a period of seven (7) days after notice of nonperformance [is] given by Lessor to Lessee* or, if the performance cannot be reasonably had within the seven (7) day period, Lessee shall not in good faith have commenced to diligently proceed to completion of performance.

\* \* \*

SECTION FOURTEEN
EFFECT OF DEFAULT

In the event of any default under this Lease agreement, as set forth in Section Thirteen, the rights of Lessor shall be as follows:

      (1) Lessor shall have the right to cancel and terminate this Lease agreement, as well as all of the right, title, and interest of Lessee under this Lease agreement, by giving to Lessee not less than thirty days' notice of the cancellation and termination.  On expiration of the time fixed in the notice, this Lease agreement and the right, title, and interest of Lessee under this Lease agreement, shall terminate in the same manner and with the same force and effect, except as to Lessee's liability, as if the date fixed in the notice of cancellation and termination were the end of the term originally set forth in this Lease agreement.

* * *

SECTION FIFTEEN
HOLDOVER BY LESSEE; PROVISION FOR MONTH-TO-
MONTH TENANCY; NOT CONSTRUED AS RENEWAL
OR EXTENSION OF LEASE

*The failure of Lessee to surrender the demised premises on the date provided for the termination of this Lease term, and the subsequent holding over by Lessee, with or without the consent of Lessor, shall result in the creation of a tenancy from month-to-month. This holding over shall not result in a renewal or extension of this Lease, and the month-to-month tenancy may be terminated at any time by Lessor giving Lessee thirty days' written notice of the intention to terminate the tenancy. All other terms and conditions of this Lease agreement shall remain in force during any month-to-month tenancy under this provision.*

SECTION SIXTEEN
HOLDOVER BY LESSEE; INCREASE IN AMOUNT OF
RENT

*If Lessee retains possession* of the demised premises or any part of the demised premises *after the termination of this Lease agreement by lapse of time or otherwise, Lessee shall pay to Lessor the monthly installments of rent, at double the rate payable* for the month immediately preceding such holding over, computed on a per-month basis, for each month or part of a month (without reduction for any such partial month) that Lessee thus remains in possession.[3]  In addition, Lessee shall pay to Lessor all direct

---

[3] The parties agree that this provision of the lease agreement means that the rent due from a holdover tenant would be $200 per month, or $2,400 per year, where the rent under the original term was $100 per month, or $1,200 per year.

and consequential damages sustained by reason of Lessee's retention of possession of the demised premises.

*The provisions of this Section shall not be deemed to limit or exclude any of Lessor's rights of reentry or any other right granted to Lessor under this Lease agreement or under law.*

\* \* \*

SECTION TWENTY-SEVEN
WAIVERS

*The failure of Lessor to insist on strict performance of any of the terms and conditions of this Lease agreement on a specific instance shall be deemed a waiver of the rights or remedies that Lessor may have regarding that specific instance only*, and [it] shall not be deemed a waiver of any subsequent breach or default in any terms and conditions.

\* \* \*

SECTION THIRTY-ONE
OPTION TO RENEW

Lessor grants to Lessee an option to renew this Lease agreement six times for periods of One (1) year per renewal, with all other terms and conditions of the renewal Lease to be the same as those in this Lease agreement. *To exercise this option, Lessee must give Lessor written notice of the intention to do so at least thirty days before this Lease agreement or any subsequent renewal period expires.* Provided, however, that the right to renew this Lease agreement shall be valid only so long as Lessee has at all times been in full compliance with the substantive portions of this Lease.

The right to exercise any renewals provided for in this Lease shall be contingent upon the Lessee maintaining its current statement of faith and bylaws (copies attached hereto) or maintaining any subsequent statement of faith and/or bylaws as may be acceptable to Lessor, and upon David L. Stephenson remaining pastor over the Lessee's church, and upon the premises being used solely for the purpose of operating a church and the related ministries of a church. The parties agree that this provision is part and parcel and of the essence of this agreement.

* * *

## SECTION THIRTY-THREE
## REMEDIES OF LESSOR

A.      *The rights and remedies given to Lessor in this Lease agreement are distinct, separate, and cumulative, and no one of them, whether or not exercised by Lessor, shall be deemed to be in exclusion of any of the others in this Lease agreement, by law, or by equity . . . .*

* * *

C.      *No receipt of money by Lessor from Lessee after default or cancellation of this Lease agreement in any lawful manner shall (1) reinstate, continue, or extend the term or affect any notice given to Lessee, (2) operate as a waiver of the right of Lessor to enforce the payment of rent and additional rent then due or falling due, or (3) operate as a waiver of the right of Lessor to recover possession of the demised premises by proper suit, action, proceeding, or other remedy.* After (1) service of notice of termination and forfeiture as provided in this Lease agreement and the expiration of the time specified in such notice, (2) the commencement of any suit, action, proceeding, or other remedy, or (3) final order or judgment for possession of the demised premises, Lessor may demand, receive, and collect any monies due . . . .

App. of Appellants at 120-35 (emphases added).

[6] During the course of the tenancy, Faulkner's relationship with the Church, its members, and Pastor Stephenson soured. Faulkner later learned that Pastor Stephenson had made numerous statements to other Church members that were not favorable to Faulkner. In particular, as a result of statements made to him by Pastor Stephenson, Tim Wood left his employment at RFA and as a salesman at The Christian Phonebook, another business owned by Faulkner. Because of the timing of Wood's departure and Wood's knowledge of The Christian Phonebook's clientele, Faulkner decided to sell that business in 2013 for $165,000, although he believed the business was worth between $180,000 and $190,000. Faulkner had originally purchased The Christian Phonebook in 2006 for $135,000.

[7] Also during the course of the tenancy, the Church never provided RFA with timely, written notices of its intent to renew the lease agreement for any of the years in which such a notice was called for under the lease. In fact, on September 24, 2010, shortly before the expiration of the original term of the lease, RFA gave notice to the Church that the Church had not yet provided written notice of its intent to renew, which had been due on September 6. The Church did not respond to the September 24, 2010, notice until nearly two weeks later, on October 7, 2010, at which time the Church provided RFA a check for $1,200 along with a written statement of the Church's intent to renew the lease. On the check, the Church denoted that the payment was for one year's rent. RFA accepted the check.

[8] In October of 2011 and in October of 2012, the Church again wrote RFA checks for $1,200, or one year's worth of rent at $100 per month, which RFA accepted. It is also not disputed that, throughout the Church's tenancy, the Church never provided RFA with cash-donation receipts, which were to state the difference between the Church's actual rent and the fair rental value for the property, or $13,900 per month, as required under Section Two of the lease agreement.

[9] On July 27, 2012, RFA gave the Church written notice to vacate the premises within sixty days. Thereafter, Cindy Stephenson, Pastor Stephenson's wife, manufactured false documents that purported to express the Church's timely notices of intent to renew for the prior years. In response to those false documents, RFA ordered the Church to vacate the premises by September 6, 2012, which the Church did. The one-year term for that year would have ended on October 6, 2012.

[10] On October 15, 2012, the Church filed suit against RFA and Faulkner for breach of contract, among other claims. On December 20, RFA and Faulkner countersued the Church for breach of contract and various tort claims, including tortious interference with a business relationship. In late 2014, the court held a four-day bench trial, following which it entered lengthy findings of fact and conclusions, entering judgment, in relevant part, for the Church on the parties' breach of contract claims and for RFA and Faulkner on their claim of tortious interference with a business relationship. The court awarded damages to the Church for breach of contract in an amount in excess of $322,000. The

court also concluded that RFA and Faulkner were not entitled to any damages on their claim for tortious interference with a business relationship because their evidence of damages was speculative. And the court fined the Church $2,500 as a sanction for Cindy's manufacturing of false documents. This appeal ensued.

# Discussion and Decision

## I. Standard of Review

[11] The parties appeal the trial court's judgment in which the court entered findings of fact and conclusions thereon following a bench trial. Generally, our standard of review is as follows:

> We may not set aside the findings or judgment unless they are clearly erroneous. In our review, we first consider whether the evidence supports the factual findings. Second, we consider whether the findings support the judgment. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it relies on an incorrect legal standard. We give due regard to the trial court's ability to assess the credibility of witnesses. While we defer substantially to findings of fact, we do not defer to conclusions of law. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.

*State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 158 (Ind. 2016) (citations and quotation marks omitted).

## II. Waiver of the Condition Precedent

[12] We first address the parties' arguments regarding whether RFA waived its right under the lease agreement to receive, at least thirty days prior to the expiration of the lease term, written notice from the Church of the Church's intent to renew the lease. The interpretation of a contract is a question of law that we review de novo. *Techna-Fit, Inc. v. Fluid Transfer Prods., Inc.*, 45 N.E.3d 399, 413 (Ind. Ct. App. 2015). We must give effect to the intentions of the parties, which are ascertained from the language of the contract in light of the surrounding circumstances. *HK New Plan Marwood Sunshine Cheyenne, LLC v. Onofrey Food Servs., Inc.*, 846 N.E.2d 318, 322 (Ind. Ct. App. 2006).

[13] However, as our supreme court has held:

> It has long been the law in this state that "[t]he performance of a condition precedent may be waived in many ways." *Johnson v. Bucklen*, 9 Ind. App. 154, 157, 36 N.E. 176, 177 (1894). One such way is by the conduct of the parties to the contract.
>
> [W]hether there has been a waiver of a contract provision is ordinarily a question of fact.

*Harrison v. Thomas*, 761 N.E.2d 816, 820 (Ind. 2002) (first alteration original to *Harrison*) (citation omitted). It is well-established that conditions precedent such as notice-of-intent-to-renew provisions are to the benefit of the lessor. *Norris Ave. Prof'l Bldg. P'ship v. Coordinated Health, LLC*, 28 N.E.3d 296, 302 (Ind. Ct. App. 2015), *trans. denied*. As such, the lessor can waive those provisions

while demanding the lessee to perform under the contract. *Id.*; *Harrison*, 761 N.E.2d at 820.

[14]     Here, the trial court concluded that RFA demonstrated its waiver of the condition precedent when RFA accepted the Church's untimely notices of the Church's intent to renew and the Church's annual rent payments.[4] We cannot agree. While waiver is ordinarily a question of fact, this court has long held that, "if notice is stipulated in the lease, . . . the mere holding over and payment of rent [i]s not sufficient notice under the contract." *Carsten v. Eickhoff*, 163 Ind. App. 294, 299-300, 323 N.E.2d 664, 667-68 (1975). "The reasoning behind demanding exact compliance with the terms of the option . . . is that the lessor is bound to grant the additional term while the lessee is free to accept or reject it." *Id.* "Thus, the courts will not hold the lessor to his promise any longer than he has agreed to be held." *Id.*

[15]     In *Carsten*, the parties entered a lease agreement providing for a three year initial lease with four ten-year options to renew. The lessees were required to notify the lessors in person or by certified mail at least sixty days prior to the expiration of a lease term in order to renew. The lessees did not provide any notice sixty days prior to the expiration of the initial three year term, but continued to perform under the lease. Nearly two years after the expiration of

---

[4] RFA asserts that the trial court erred when it relied on parts of a prior summary judgment order in its final judgment without complying with Indiana Trial Rule 56(D). We need not discuss this issue on appeal, however. Those findings discuss whether RFA invoiced the Church for one year's rent, but at oral argument counsel for the Church conceded that RFA never sent the Church any such invoices.

the initial term, the lessors informed the lessees that they considered the lease to be terminated and demanded the lessees vacate the premises. We concluded the notice requirement in the lease "evidence[d] an intent of the parties that there was to be no 'extension' or 'renewal' of the lease without the required notice [and therefore] the giving of the required notice is a condition precedent to the right of renewal." *Id.* at 668. Moreover, we held in response to the lessees' argument that the lessors were estopped from denying the renewal term that in the absence of fraud, accident, surprise or mistake, "[m]ere silence on the part of the lessor is not a waiver unless he has a duty to speak." *Id.* at 669. The lessors' acceptance of payment under the lease during the two years following the expiration of the lease did not constitute acquiescence in a ten-year term and was not inconsistent with a tenancy from year to year. *Id.*

[16] We conclude that *Carsten* is controlling on these facts. Pursuant to the language of the parties' lease agreement and the undisputed facts, RFA has not agreed to be held to providing the Church with any of the Church's claimed option terms. Rather, as with the lessee in *Carsten*, the Church failed to provide RFA with proper notice of the Church's intent to renew the lease. Instead, the Church merely held over and paid the same rent it had been paying. As a matter of law, the trial court erred when it concluded that that evidence demonstrated RFA's waiver of the condition precedent. *See id.*

[17] The lease agreement and the undisputed facts demonstrate that the Church defaulted on its option to renew the lease in October of 2010. Again, Section Thirteen of the lease agreement plainly states that, "[i]f Lessee shall fail to

perform or comply with any of the conditions of this Lease agreement and if the nonperformance shall continue for a period of seven (7) days after notice of nonperformance [is] given by Lessor to Lessee," the lessee shall be in default on those conditions. App. of Appellants at 126. The facts demonstrate that the Church did not comply with the condition to provide written notice of the Church's intent to renew the lease agreement thirty days prior to the expiration of the original lease term. In light of the Church's failure to provide that notice, on September 24, 2010, RFA notified the Church of its nonperformance. But the Church did not respond to RFA's notice within seven days as required by Section Thirteen; instead, the Church responded nearly two full weeks later, on October 7, 2010. The Church's response was not simply untimely; it happened after the original lease term expired on October 6. *Cf. Powers v. City of Lafayette*, 622 N.E.2d 1311, 1314-15 (Ind. Ct. App. 1993) (holding that the lessee's late notice was nonetheless prior to the expiration of the lease, which, along with other facts, supported the lessor's intent to waive the condition precedent), *trans. denied*. Pursuant to the lease agreement's plain language and given the Church's untimely response, the Church defaulted on its option to renew the lease.[5]

---

[5] The point of RFA's September 24, 2010, letter is not to say that it provided the Church an opportunity to comply with the thirty days' notice requirement, as that window had closed. Rather, the point is that the letter established RFA's intent to hold the Church to Section Thirteen of the lease agreement on default if the Church continued its noncompliance.

Further, the lease agreement expressly provides that RFA's acceptance of ensuing rent payments from the Church could not circumvent the Church's default. In particular, Section Thirty-Three states that "[n]o receipt of money by Lessor from Lessee after default . . . shall (1) reinstate, continue, or extend the term . . . [of the] Lessee . . . or (3) operate as a waiver of the right of Lessor to recover possession of the demised premises . . . ." Appellants' App. at 132. And, because the Church was, as a matter of law, a holdover tenant, Section Fifteen of the lease is also relevant. That Section states that "holding over shall not result in a renewal or extension of this Lease" and, in the event of a holdover, "[a]ll other terms and conditions of this Lease agreement shall remain in force . . . ." *Id.* at 127. By the lease agreement's plain terms, merely holding over and paying the same rent does not entitle the lessee to a renewal of the lease and does not evince an intent by the lessor to allow such a renewal after the lessee's default. *See, e.g.*, *HK New Plan*, 846 N.E.2d at 325 (holding that, "[u]nder the clear language of the Lease . . . , [the lessor] did not waive [the lessee's] default by accepting late payments").

Nonetheless, the Church argues, and the trial court agreed, that the instant facts are more similar to those in *Norris* than those in *Carsten*. In *Norris*, we recognized that a lessor can demonstrate its intent to waive its right to written notice of a lessee's attempt to exercise an option term when the lessor accepts increased rent payments from the lessee that are in compliance with the lease agreement's requirements for the option terms. 28 N.E.3d at 302-03. In so holding, we explained that, under Indiana common law, holding over renews

the original lease terms, and, by accepting the rent payments that were in accordance with the lease rather than common law, the lessor was aware of the lessee's intent to exercise the option terms. *Id.* at 303. We further noted that the lessor had the right to rely on the lessee's apparent exercise of the option terms. *Id.*

[20] The crux of the Church's reliance on *Norris* is that, here, the lease agreement required a holdover tenant to pay double the rent of a non-holdover tenant. Accordingly, the Church continues, by *not* paying that increased rent, the Church, like the lessee in *Norris*, made its intent to exercise the option terms apparent. Thus, the Church asserts RFA manifested its intent to waive the condition precedent of written notice from the Church by accepting the Church's rent payments following the original term.

[21] We cannot agree with the Church that the instant facts are like those in *Norris*. Although the lease agreement called for a materially different rent payment from a holdover tenant than from a non-holdover tenant, that is not dispositive in light of the totality of the lease agreement. Unlike in *Norris*, the lease agreement here expressly prohibits finding that the lessor's failure to insist on the higher rent payment evinces an intent by the lessor to waive its right to the condition precedent to renew the lease.

[22] In particular, Section Twenty-Seven of the lease agreement states that "[t]he failure of the Lessor to insist on strict performance of any of the terms and conditions of this Lease agreement on a specific instance," such as the failure to

insist on a holdover tenant's strict compliance with the increased rent due in a holdover term, "shall be deemed a waiver of the rights or remedies that Lessor may have *regarding that specific instance only* . . . ." Appellant's App. at 130 (emphasis added). Thus, Section Twenty-Seven prohibits using the lessor's failure to insist on strict performance in one instance to demonstrate a waiver in another instance. Further, Section Thirty-Three specifies that the "rights and remedies given to Lessor in this Lease agreement are distinct, separate, and cumulative, and no one of them, whether or not exercised by Lessor, shall be deemed to be in exclusion of any of the others in this Lease agreement, by law, or by equity . . . ." *Id.* at 132. Section Sixteen, which describes a holdover tenancy, itself mandates that its provisions "shall not be deemed to limit or exclude any of the Lessor's rights of reentry or any other right granted to Lessor . . . ." *Id.* at 127. And, again, Sections Fifteen and Thirty-Three prohibit the conclusion that the lessor intended to renew the lease after a default simply because the lessor accepted a partial rent payment.

[23] The Church's reliance on *Norris*, in effect, would require us to conclude that RFA's waiver of its right to the increased payments due from a holdover tenant operates to waive RFA's right to receive written notice of the Church's intent to exercise its option terms. But that conclusion is contrary to the lease agreement's several non-waiver provisions, which reserved the rights of the lessor. Further, in light of the lease agreement's several non-waiver provisions, the Church had no right to rely on RFA's acceptance of the Church's rent payments following the Church's default; RFA's failure to demand the higher

rent did not diminish or abrogate any of RFA's other rights under the lease. In other words, the lease agreement here is materially different from the lease agreement in *Norris*, and the material facts found by the trial court to support RFA's waiver of its right to written notice, as a condition precedent to the exercise of the option terms, do not properly account for the language of the lease agreement.

[24]     In sum, case law, the lease agreement, and the undisputed facts make clear that the Church was a holdover tenant following the expiration of the lease agreement's original term. As a holdover tenant, the Church continued to pay the same rent it had been paying, and RFA waived its right to the increased rent payments due from the Church as a holdover tenant. But the lease agreement makes clear that RFA's waiver of its right to collect the increased rent cannot operate to waive another right under the lease agreement. Accordingly, the trial court erred when it found that the Church's continued occupancy and RFA's continued acceptance of rent demonstrated RFA's intent to waive its right to written notice from the Church of the Church's intent to exercise the option terms. Because RFA was dealing with a holdover tenant in July of 2012, RFA was within its rights under the lease agreement to evict the Church so long as RFA provided the Church with at least thirty days' written notice, which it is

undisputed that RFA did.[6]  Hence, RFA did not breach its contract with the Church, and it owes the Church no damages on that claim.

## II.  Tort Damages

[25]  RFA and Faulkner also argue that the trial court erred in awarding them no damages on their claim that the Church had tortiously interfered with their business relationships with Wood by causing Wood to leave his employment at RFA and The Christian Phonebook, the latter of which, according to Faulkner, caused Faulkner to sell that business at a discounted price.  We reject RFA's and Faulkner's arguments on this issue.  Their only argument with respect to damages is that Faulkner's testimony supports the conclusion that he had to sell The Christian Phonebook at a discounted price.  Again, the trial court expressly found that testimony to be speculative.  Thus, RFA's and Faulkner's argument on damages is simply a request for this court to credit evidence that the trial court expressly refused to credit, contrary to our standard of review.  Because RFA and Faulkner cannot show that the trial court clearly erred when it discredited their only evidence of damages, we affirm on this issue.

---

[6] In its brief on appeal, the Church relies on *Pierce v. Yochum*, 164 Ind. App. 443, 330 N.E.2d 102 (1975), for the proposition that, once the facts demonstrate that one party to a contract has waived a contractual provision, that party is estopped from later demanding strict compliance with that provision absent notice. But as we hold that the facts here do not demonstrate RFA's waiver in the first instance, *Pierce* is inapposite.

# Conclusion

The trial court's determination that RFA waived its right to receive written notice of the Church's intent to renew the parties' lease agreement is not supported by sufficient evidence, and we therefore reverse the trial court's judgment and damage award for the Church on its breach of contract claim. The trial court's determination that RFA and Faulkner failed to meet their burden of proof to show damages on their claim for tortious interference with a business relationship is not clearly erroneous, however, and we affirm that part of the judgment. Accordingly, we affirm in part, reverse in part, and remand for the trial court to amend its judgment consistent with this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings.

Riley, J., and Crone, J., concur.